**UNITED STATE DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------------x
NORTHWELL HEALTH, INC.,

                Plaintiff,

                                       Case No. 2:23-cv-00389-JS-ST

     -against-

PREMERA BLUE CROSS,

                Defendant.
---------------------------------------------------------x

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**<u>DEFENDANT'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)</u>**

Timothy F. Butler, Esq.
Meredith F. McBride, Esq.
David J. McCarthy, Esq.
BUTLER TIBBETTS, LLC
*Attorneys for Plaintiff Northwell Health, Inc.*
Nine East 45th Street, 9th Floor
New York, NY 10017
Telephone: (203) 656-1066

## <u>TABLE OF CONTENTS</u>

**<u>TABLE OF AUTHORITIES</u>** ........................................................................................... ii

**PRELIMINARY STATEMENT** ................................................................................ 1

**SUMMARY OF FACTS ALLEGED** ......................................................................... 1

**LEGAL ARGUMENT** ................................................................................................ 4

**POINT I: The AC States A Valid Claim For Breach Of The Provider Agreement.** ............. 4

**A. The AC plausibly pleads Defendant is bound by the terms of the Provider Agreement.** 5

    1. **Empire acted as Defendant's agent in binding Defendant as a party to the Provider Agreement.** ......................................................................... 7
    2. **Functional privity.** ............................................................................. 12
    3. **The Provider Agreement, and other documentary evidence, evince Defendant's obligation to pay Northwell.** ............................................ 14
    4. **Non-signatory's manifestation of intent to be bound.** ........................... 16

**B. The breach of contact cases cited by Defendant are inapposite.** .......................... 17

**C. The AC pleads the formation of the Provider Agreement and the grounds on which Defendant is bound by the BlueCard terms included in it.** ............................... 18

**POINT II: The AC Pleads A Valid Third-Party Beneficiary Claim.** .................... 19

**POINT III: The Third Cause Of Action States A Valid, Alternative Quasi-Contract Claim.** ................................................................. 22

**A. Defendant benefited from Northwell's healthcare services.** ............................. 22

**B. The alternative quasi-contract claim is not governed by any contract.** .......................... 23

**CONCLUSION** ......................................................................................................... 25

## **TABLE OF AUTHORITIES**

Cases

*Aievoli v. Farley*, 636 N.Y.S.2d 833 (2d Dept. 1996). ........................................................ 20

*Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F.Supp.3d 379 (2019) ................................ 8

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................................... 4

*ATSI Communications Inc. v. Shear Fund, Ltd*., 493 F.3d 87 (2d Cir. 2007) ............................ 4

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................................................... 4

*Bild v. Konig*, 2011 WL 1563576 (E.D.N.Y. Apr. 25, 2011) ..................................................... 20

*Cal. Spine & Neurosurgery Inst. v. Oxford Health Ins. Inc.*, 2019 WL 6171040 (N.D. Cal. Nov. 20, 2019) ................................................................................................................................ 22

*Donnenfeld v. Petro, Inc.*, 333 F. Supp. 3d 208 (E.D.N.Y. (E.D.N.Y. 2018) ............................ 4

*El Paso Healthcare Sys., LTD v. Molina Healthcare of N.M., Inc.*, 683 F. Supp. 2d 454 (W.D. Tex. 2010) ............................................................................................................................... 22

*Emergency Physician Services of New York v. UnitedHealth Group, Inc*., 2021 WL 4437166 (S.D.N.Y. September 28, 2021) ......................................................................................... 22, 20

*ESI, Inc. v. Coastal Corp.*, 61 F.Supp.2d 35 (S.D.N.Y. 1999) ............................................... 14

*Eternity Glo. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168 (2d Cir. 2004)... 4

*Fla. Emergency Physicians Kang & Assocs., M.D.*, 526 F. Supp. 3d 1282 (S.D. Fla. 2021) ...... 22

*Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y.2d 38 (1985)......................... 20

*Impulse Marketing Group, Inc. v. National Small Business Alliance, Inc.*, 2007 WL 1701813 (S.D.N.Y. June 12, 2007)..................................................................................................... 16

*Kahuna Group, Inc. v. Scarano Boat Building, Inc.*, 984 F. Supp. 109 (N.D.N.Y. 1997) .......... 12

*Kapsis v. American Home Mortg. Servicing Inc.*, 923 F. Supp. 2d 430 (E.D.N.Y. 2013) .......... 24

*Kitchen Winners NY Inc. v. Rock Fintek LLC*, 2023 WL 2746031 (S.D.N.Y. March 31, 2023) ... 7

*Krolick v. Sloane*, 2021 WL 5280990 (S.D.N.Y. Nov. 12, 2021) ............................................. 18

*Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173 (2011) ............................................... 17

*MBIA Ins. Corp. v. Royal Bank of Canada*, 706 F.Supp.2d 380 (S.D.N.Y. 2009)..................... 16

*N.Y.C. Health & Hosps. Corp. v. Wellcare of N.Y., Inc.*, 937 N.Y.S.2d 540 (N.Y. Sup. Ct. 2011) ............................................................................................................................................. 22

*Pac. Carlton Dev. Corp. v. 752 Pac., LLC*, 62 A.D.3d 677 (2d Dep't 2009) ............................. 18

*Plastic Surgery Ctr. v. Aetna Life Ins. Co.*, 967 F.3d 218 (3d Cir. 2020)............................ 22, 23

*Plastic Surgery Ctr., P.A. v. Cigna Health & Life Ins. Co.*, 2019 WL 1916205 (D. N.J. Apr. 30, 2019) ...................................................................................................................................... 23

*Pollock v. Ridge*, 310 F. Supp. 2d 519 (W.D.N.Y. 2004)......................................................... 20

*River Park Hospital, Inc. v. BlueCross BlueShield of Tennessee, Inc.*, 173 S.W.3d 43 (Tenn. Ct.App. 2002)......................................................................................................................... 22

*Schaffe v. SimmsParris*, 82 A.D.3d 867 (2d Dep't 2011)...................................................... 18

*St. John's University v. Bolton*, 757 F. Supp. 2d 144 (E.D.N.Y 2010) ................................... 25

*Temple University Hospital, Inc. v. Healthcare Management Alternatives, Inc.*, 832 A.2d 501 (Pa Super. 2003) .......................................................................................................................... 22

*Thomas v. New York City*, 814 F. Supp. 1139 (E.D.N.Y. 1993) ............................................... 20

*Travelers Indem. Co. of Conn. v. Losco Grp., Inc.*, 150 F. Supp. 2d 556 (S.D.N.Y. 2001)......... 23

*York v. Ass'n of Bar of City of N.Y.*, 286 F.3d 122 (2d Cir. 2002) ............................................ 4

Statutes

Fed. R. Civ. P. 8 ................................................................................................................ 4

Other Authorities

2013 IRS NASR 3701F, 2013 WL 10257206 (released Sept. 13, 2013) .......................... 9-11, 15

Treatises

*Restatement (Third) of Agency* § 2.02 ...................................................................... 11
*Restatement (Third) of Agency* § 3.01 ...................................................................... 11
*Restatement (Third) of Agency*, § 1.01 ...................................................................... 11

Plaintiff Northwell Health, Inc. ("Northwell"), by and through its attorneys, Butler Tibbetts, LLC, submits this memorandum of law in opposition the motion of Defendant Premera Blue Cross ("Defendant") to dismiss the Amended Complaint, Doc. No. 17 ("AC").

## PRELIMINARY STATEMENT

Defendant's insureds accessed Northwell's in-network services via Northwell's in-network provider agreement with Empire Blue Cross ("Empire"). Defendant authorized and directed payment to Northwell for healthcare services Northwell provided to Defendant's insureds. The payments to Northwell authorized by and on behalf of Defendant were not for the correct amount due under the provider agreement. Defendant baselessly asserts in its motion that it has no obligation to pay the correct amount due to Northwell for the healthcare services.

## SUMMARY OF FACTS ALLEGED

Northwell has an in-network Provider Agreement with Empire, which as amended, is referred to as the "Provider Agreement." (AC ¶¶ 18-19)

Empire and Defendant are two of the thirty-four members of the Blue Cross Blue Shield Association ("BCBSA"). (AC ¶ 10)  As BCBSA members, they both must "effectively and efficiently participate in [the BCBSA's Blue Card Program] . . . adopted by the Member Plans for the purposes of providing portability of membership between the Plans and ease of claims processing for customers receiving benefits outside of the Plan's Service Area."  Each of them also "shall take such action as required to ensure its financial performance in programs and contracts [such as the Blue Card Program]." (AC ¶¶ 11-13)

The BCBSA's Blue Card Program "**links** participating healthcare providers and the [thirty-four] independent Blue Cross Blue Shield companies across the country in a single electronic network for claims processing and reimbursement" and the BCBSA refers to the

participating healthcare providers of all the BCBSA members as "**our national network.**" (AC ¶¶ 14-16) (emphasis added).

Empire, as a participant in the Blue Card Program, was required to, and therefore, had the consent and authorization of all the other BCBSA members to, include the following terms (the "BlueCard terms") in its Provider Agreement with Northwell (AC ¶¶ 20-23, 41):

(1)  a requirement that "all Payers . . . shall be entitled to access the services of [Northwell] Providers that participate in the Empire network;" (*Id*. at ¶¶ 21, 41)

(2) a corresponding requirement that the "Payers" pay Northwell for the healthcare services it provides to patients insured by the Payers "at the applicable rates and all the other applicable terms of [the Provider] Agreement;" (*Id*. at ¶¶ 21, 41)

(3) a requirement that the "Payers" are "bound by . . .the applicable terms of [the Provider] Agreement;" (*Id*. at ¶¶ 22, 41)

(4) a requirement that "Payers" are "parties . . . legally responsible for payment of Covered Services," (AC ¶¶ 22, 41) and

(5) a definition of those "Payers" who are (i) granted access to Northwell's services, (ii) obligated to pay Northwell, (iii) bound by the terms of the Provider Agreement, and (iv) legally responsible for payment of Covered Services, which includes Defendant's "Blue Card Plans" and any of Defendant's customers who are "entitled to access the network of any [of Defendant's] Blue Card Plan[s];"  (*Id*. at ¶¶ 21, 41)

Empire's inclusion of these BlueCard terms in its in-network provider agreement with Northwell established the BCBSA required "link" between each of the thirty-three other BCBSA members and Northwell in their "national network" of healthcare providers (AC ¶¶ 16-17, 20-23, 24-37, 41-45), including the link requiring the non-local BCBSA member (Defendant, here) to pay the healthcare provider (Northwell, here) for the treatment rendered to patients insured under that non-local BCBSA member's Blue Card Plans. (AC ¶¶ 22, 30-34, 41, 42-45)

When a patient insured by one of Defendant's BlueCard plans received healthcare from Northwell, that patient presented an insurance card the patient received from Defendant, which Northwell understood and reasonably believed to be an assurance by Defendant of its intention to

pay Northwell for the healthcare provided to the patient under the Blue Card program (AC ¶¶ 7-8, 25-27), which is consistent with the BlueCard terms in the Provider Agreement. (AC ¶¶ 22)

Northwell timely submitted to Empire statements of its billed charges for the medically necessary healthcare provided to each of the Patients insured by Defendant during the period of January 1, 2019 through December 31, 2022. The total of the billed charges is $1,449,252.91. (AC ¶¶ 5, 28) Northwell understood Empire would process the claim by presenting Northwell's billed charges to Defendant in a standard claim format, from which Defendant then makes a claim determination and transmits the claim disposition to Empire. (AC ¶¶ 29-31)

After Defendant transmits its claim disposition on a Northwell claim, Empire sends to Northwell whatever explanation of payment or remittance advice that Empire received from Defendant. (AC ¶ 32)  Defendant then either pays, or causes Empire to pay, the amount Defendant has determined is due to Northwell.  (AC ¶ 31)  If Defendant chooses to cause Empire to pay Northwell, Defendant will direct and authorize Empire to pay Northwell, on behalf of Defendant and as Defendant's agent, the amount, if any, Defendant determined Northwell should receive for its treatment of a patient insured by Defendant's Blue Card Plan. (AC ¶¶ 32, 34)

The Provider Agreement does not say Empire is the "Payer" of these Northwell claims; it says Defendant is the "Payer."  (AC ¶¶ 21-22) If Empire makes a payment to Northwell for healthcare services provided to Defendant's insureds, it only does so as Defendant's agent, after Defendant has directed Empire to do so on its behalf, and only after Defendant has provided Empire with the funds to make the payment to Northwell on Defendant's behalf.  (AC ¶¶ 33-34)

The amount Defendant underpaid, and still owes to, Northwell is no less than $913,058.33 (AC ¶¶ 38, 53) and "the applicable terms" of the Provider Agreement that Defendant was "bound by," but failed to adhere to, are described in the AC. (AC ¶¶ 49-51)

## LEGAL ARGUMENT

"[A] complaint must contain sufficient factual material, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678.

A court "accept[s] all factual allegations in the complaint and draw[s] all reasonable inferences in the plaintiff's favor," *ATSI Communications Inc. v. Shear Fund, Ltd*., 493 F.3d 87, 98 (2d Cir. 2007) and construes the complaint "in the light most favorable to the plaintiff[.]" *York v. Ass'n of Bar of City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002) Fed. R. Civ. P. 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief." But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678.

**POINT I: The AC States A Valid Claim For Breach Of The Provider Agreement.**

To allege a breach of contract, a plaintiff must plead "(1) the existence of a contract, (2) adequate performance of the contract by plaintiff, (3) breach of the contract by defendant, and (4) damages. *Donnenfeld v. Petro, Inc.*, 333 F. Supp. 3d 208, 218 (E.D.N.Y. (E.D.N.Y. 2018) (quoting *Eternity Glo. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004). The AC pleads each of these elements. *See* AC ¶¶ 18-23 (existence of contract); AC ¶¶ 6-8, 26-28, 35-37 (Northwell's performance); AC ¶¶ 20-23, 26-28, 38, 49-53 (Defendant's breach and Northwell's damages).

**A.  The AC plausibly pleads Defendant is bound by the terms of the Provider Agreement.**

Defendant asserts the Court should dismiss the breach of contract claim because Northwell "does not allege that Northwell and [Defendant] have a contract with each other." (Moving Memo at 8)  That is not true.

The Provider Agreement is an enforceable written contract. It includes multiple references to the rights and obligations of Defendant, and all other BCBSA members, under the Provider Agreement. The Provider Agreement refers to the Defendant's Blue Card Plans, and the Blue Card Plans of all other BCBSA members, as "parties" to the Provider Agreement. (AC ¶ 22)  The Provider Agreement also defines and identifies Defendant's Blue Card Plans as the "Payers" when Northwell treats patients insured under any of those Blue Card Plans.  (*Id.*)  The Provider Agreement further states that Defendant's Blue Card Plans, as defined and identified Payers, have the following rights and obligations under that contract:  (1) they "shall be entitled to access the services of [Northwell] Providers that participate in the Empire network" (AC ¶ 21); (2) they "are bound by the applicable rates and all other applicable terms of [the Provider] Agreement" (AC ¶ 22); and (3) they "are legally responsible for payment of Covered Services" provided by Northwell to patient's insured under Defendant's Blue Card Plans.  (*Id.*)

Northwell also included in the AC contextual allegations explaining why Empire included these BlueCard terms in the Provider Agreement; *i.e.*, because the BCBSA, and all the BCBSA members, want each BCBSA member to include, and know they each will include, these same, or similar, terms in each of their agreements with their local in-network providers. In that way, each BCBSA member's Blue Card Plans (1) is contractually entitled to access the services of any provider with an in-network agreement with any other BCBSA member, at the in-network rates in those agreements, and (2) will have the corresponding contractual obligation

to pay that local in-network provider for treatment of a patient insured by the BCSA member's Blue Card Plans.  (AC ¶¶ 11-17, 20-23 31-34, 41, 42, 43, 45)

The AC also pleads that over many years (1) Defendant repeatedly enjoyed the contractual right of access to Northwell's services and Northwell's in-network rates under the terms of the Provider Agreement (AC ¶ 43), and (2) Defendant repeatedly purported to comply with its contractual payment obligation under the Provider Agreement by directing and authorizing Empire, its agent, to make payments to Northwell (albeit in incorrect amounts) on behalf of Defendant with funds provided by Defendant.  (AC ¶¶ 31-34, 38, 50, 53)

Ignoring these alleged facts, Defendant still asserts that it is not bound by the BlueCard terms in the Provider Agreement. Defendant appears to base that conclusion, in part, on its repeated assertions that Empire, not Defendant, is the party obligated to pay Northwell for treatment of patients insured under Defendant's Blue Card Plans. (Moving Memo at 1, 5, and 6) That assertion is false and misleading.

The Provider Agreement does not impose on Empire any obligation as the Payer of Northwell claims for healthcare services provided to patients insured under Defendant's Blue Card Plans.  (AC ¶ 33)  Moreover, the AC alleges, and Defendant ignores, that if Empire ever did make a payment to Northwell, it did so on behalf of Defendant as Defendant's agent, and even then, Empire only did so after being directed and authorized to do so on behalf of Defendant, and after Defendant makes funds available to Empire to make the payment to Northwell.  (AC ¶ 34; AC ¶¶ 31, 32)  Northwell's claims are for services provided to Defendant's insured's, not for treatment of patients insured by Empire.  Therefore, when Empire, acting on behalf of, and as an agent for, Defendant, makes a payment to Northwell, and does so with funds provided by Defendant, it is Defendant, not Empire, who is the Payer, and it is

Defendant who is the proper party to sue when the payment is for an incorrect amount. All of which is dictated by the Provider Agreement terms identifying the Defendant as the "part[y] who [is] legally responsible for payment of Covered Services" that Northwell renders to a patient insured under any of Defendant's Blue Card Plans. (AC ¶ 22) The Chief Counsel of the Internal Revenue Service has published a report reaching the same conclusion. *See infra* at 9-11. Defendant does not point to any language in the Provider Agreement, or cite any legal authority, for its purely speculative conjecture otherwise.

Defendant also bases its "no contract exists between Northwell and Defendant" argument on a purported Northwell admission that "Defendant was not a signatory to the Provider Agreement." (Moving Memo at 8, citing AC ¶ 42) That is not an admission that the non-signatory Defendant is not bound as a party to the Provider Agreement. Elsewhere in the AC Northwell alleges that, although Defendant did not sign the Provider Agreement, it nevertheless is bound by its terms. (AC ¶¶ 41-46, see also AC ¶¶ 20-23, 25-27, 33-34, and 52)

Defendant, in its zeal to equate its status as a non-signatory of the Provider Agreement with its hasty and unsupported legal conclusion that Defendant therefore is not bound by the terms of that contract, ignores the import of the numerous factual allegations in the AC which plausibly support Northwell's claim that the non-signatory Defendant is bound by the terms of the Provider Agreement.

### 1. Empire acted as Defendant's agent in binding Defendant as a party to the Provider Agreement.

One circumstance where a non-signatory is bound by a contract is when the contract in question – here, the Provider Agreement – was signed by the non-signatory's agent. *See e.g.*, *Kitchen Winners NY Inc. v. Rock Fintek LLC*, 2023 WL 2746031, at *11-12 (S.D.N.Y. March 31, 2023) ("a contract may bind a party that did not sign the contract 'where the contract was signed

by the party's agent[.]'"); *see also Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F.Supp.3d 379, 390 (2019) (recognizing non-signatory is bound to a contract signed by its agent, but dismissing claim that did not allege a signatory acted as defendant's agent).

Here, the AC alleges Empire acted as Defendant's agent when it made payments to Northwell on Defendant's behalf and only after being authorized and directed to do so, and only if Defendant first provided Empire access to funds to make the payments on Defendant's behalf. (AC ¶¶ 31, 33, 34)  Likewise, the AC alleges Empire facilitated Defendant's claims processing in a manner that was consistent with it acting as Defendant's agent.  (AC ¶¶ 28-29, 31, 33-34) The AC also pleads why Empire included the BlueCard terms in the Provider Agreement; *i.e.* the terms (1) giving all other BCBSA Members access to Northwell's services and Northwell's in-network rates with Empire, (2) specifying that all other BCBSA Members were "bound by all the other applicable terms of" the Provider Agreement, (3) identifying Defendant as a "party" in the Provider Agreement, and (4) identifying Defendant as the "Payer" legally responsible to pay Northwell for the healthcare provided to Defendant's insureds. (AC ¶¶ 21-23, 40-41) Empire did so because as participants in the Blue Card Program all BCBSA members want each BCBSA member to include, and know they each will include, these same, or similar, terms in each of their agreements with their local in-network providers. (AC ¶¶ 11-17, 20-23 31-34, 41, 42, 43, 45) Such terms are needed in every BCBSA member's in-network provider agreements to ensure that each BCBSA member's Blue Card Plans (1) will be contractually entitled to access the services of any local provider with an in-network agreement with any other BCBSA member, at the in-network rates in those provider agreements, and (2) also will have the corresponding contractual obligation to pay the local in-network provider of another BCBSA member for treatment of a patient insured by the Blue Card Plans of that other BCBSA member. (*Id.*)

These, and the related allegations, plausibly support a finding that Empire was acting as an agent for the other BCBSA Members, including Defendant, when it added the Blue Card terms to the Provider Agreement, when it signed the Provider Agreement, and when it helped process Northwell's claims and pay Northwell, on behalf of, at the direction of, and with the authorization of, Defendant, which immediately reimbursed its agent for having made the payment on its behalf.  (Id.)  Those same contextual allegations, and the allegations regarding Defendant's conduct with respect to Northwell's claims for treatment provided to patients insured under Defendant's Blue Crad Plans, including Defendant's determinations of the amounts to be paid to Northwell and its causing payments of those Northwell claims, further support a plausible factual inference that Defendant, as a Blue Card Program participant, has always been aware that it, and not Empire, is the party liable for payments of the correct amount due to Northwell under its Provider Agreement with Empire for care provided to patients insured under Defendant's Blue Card Plans.

The Office of the Chief Counsel of the Internal Revenue Service agrees, having found the relationship between the Home and Host Licensees in the BCBSA Blue Card program is a principal-agent relationship, and that the Home Licensee is the party obligated to pay the provider who treated a patient insured by the Home Licensee,  *See* Internal Revenue Service Chief Counsel Memorandum, 2013 IRS NASR 3701F, 2013 WL 10257206 (released Sept. 13, 2013).[1]  In the IRS Memorandum, the Chief Counsel responded to an inquiry whether a BCBSA Host Licensee (such as Empire in this case) or a BCBSA Home Licensee (such as Defendant in this case) was entitled to a tax deduction for payments made to local providers who treated patients insured under a Blue Card Plan of the BCBSA Home Licensee. (IRS Memo. at 4) These

---

[1] Cited for plausibility reference only, not for legal conclusions therein.

payments that were the source of the deduction considered in the IRS Memo were payments made to the Host Licensee's in-network provider; i.e., the same kind of payments, albeit underpayments, to Northwell here.

The Chief Counsel describes at length how such provider claims are processed, beginning with the provider submitting its charges to the local Host Licensee, and later resulting in the Home Licensee issuing a Disposition Form which includes the result of its claim determination and an authorization to the Host Licensee to pay the healthcare provider the amount specified by the Home Licensee. (*Id*. at 5-6) The Host Licensee then records its own receivable from the Home Licensee for reimbursement of the "approved provider payment" which the Home Licensee directed the Host Licensee to make to the provider on its behalf.  (*Id*. at 7) The Home Licensee makes a complementary record of its own liability to reimburse the Host Licensee for the payment the Host Licensee made to the provider, at the direction of, and on behalf of, the Home Licensee. (*Id*. at 6-7)

After the Host Licensee makes the approved provider payment authorized by the Home Licensee, a Bank retained to administer the payments among the BCBS Licensees in the BlueCard program, referred to as the Central Finance Agency ("CFA"), then makes transfers in the Home and Host Licensees' accounts to reimburse the Host Plan for the payment made to the local provider at the direction, and with the authorization, of the Home Licensee.  (*Id*. at 8)

According to the Chief Counsel, the pertinent agreements and procedures governing the interactions among the Home and Host Licensees and the CFA Bank were established because the BCBSA "recognize[s] that the BCBS Licensees will make benefit payments **on behalf of other Licensees** and that, pursuant to the Licensees' license agreement with BCBSA, each Licensee is required to reimburse the Licensee that makes the benefit payment **on its behalf**."

(*Id*. at 8) (emphasis added)  This "on behalf of" language in the IRS Memo is the *sine qua non* of a principal-agent relationship.  *See, e.g., Restatement (Third) of Agency*, § 1.01 ("Agency defined"), § 2.02 ("apparent authority defined"); § 3.01 ("Creation of actual authority").  The IRS Chief Counsel later confirms that the relationships among the participants in the BlueCard Program is a principal-agent relationship in which the Host Licensee is acting as an agent on behalf of the Home Licensee, stating:

> Taxpayer (Host Plan) is reimbursed by the Home Plan for provider payments through the CFA within 3 to 5 days. . . .   Taxpayer (Par/Host Plan) merely pays the claims **(claims processing agent)** and is reimbursed by the Home Plan for claim payments[.]  [Taxpayer] does not assume any risk of not being reimbursed for payments to providers.

(*Id*. at 15) (emphasis added).

The IRS Chief Counsel found the Host Plan's payments to its in-network providers (here, Empire payments to Northwell) "are not for claims, liabilities or expenses incurred by the [Host] Taxpayer [but rather] **are the result of [provider] claims against, or incurred by, other Blue Plans – the Home Plans** – for out-of-territory services rendered to the Home Plan's Members." (*Id*. at 14) (emphasis added)  In addition, Chief Counsel found "[t]the Home Plan bears all insurance risk," and the "Taxpayer [Host Plan] has no insurance risk."  (*Id*. at 15-16)[2]

Northwell pleads a facially plausible claim that Empire acted as Defendant's agent when it included the BlueCard terms in the Provider Agreement, and later, when Empire assisted in the processing of Northwell's claims for services provided to patients insured under Defendant's Blue Card Plans, and when Empire paid Northwell the amount directed, and authorized, by

---

[2] The Chief Counsel's findings, including that the Host Licensee acts as the agent for the Home Licensee, "is based upon an examination and analysis of records (License Agreement, Membership Standards, Inter-Plan Programs, Manuals, BlueCard Program Manual, CFA contract, and other necessary information) provided by Taxpayer to substantiate the nature and amount of the Host deductions."  (Id. at 4, and 17-18)

Defendant, and was provided access to Defendant's funds to make that payment to Northwell on behalf of Defendant.  This alone is grounds to plausibly assert the non-signatory Defendant is bound by, and can be sued for its breach of, the BlueCard terms in the Provider Agreement.

### 2.  Functional privity.

A non-signatory can also be bound as a party to the terms of a contract where there is functional privity with the signatories to the contract.  In *Kahuna Group, Inc. v. Scarano Boat Building, Inc.*, 984 F. Supp. 109 (N.D.N.Y. 1997), the court, in denying a non-signatory's motion for summary judgment, found there was sufficient evidence of the functional equivalent of privity because the plaintiff "understood the written agreement to encompass [the non-signatory] Defendants as well, particularly because [plaintiff] was never told that the [non-signatory] Defendants were not part of the [signatory Defendant's] operation."  *Id*. at 113.

The AC alleges a more substantial basis for functional privity than the court found in *Kahuna*.  The Provider Agreement actually states Defendant's Blue Card Plans (i) are "parties" to the contract, (ii) are "entitled to access the services of [Northwell] Providers that participate in the Empire network"; (iii) are obligated and bound as "Payers" to pay Northwell at "the applicable rates and all other applicable terms of [the Provider] Agreement", and (iv) as "Payers" are legally responsible to pay for Covered Services."  *See supra* at 2.  Such provisions manifest Empire's intention to bind Defendant to the BlueCard terms in the Provider Agreement, and that Northwell reasonably understood that Defendant was so bound.

In addition, functional privity between Defendant's Blue Card Plans and Northwell is the direct and intended result of Defendant's and Empire's respective obligations under the Blue Card Program, including Defendant's obligation to pay Northwell. (AC ¶¶ 16-17, 20-23, 45) The BCBSA's website describes this functional privity between providers and each of the BCBSA

members, stating the Blue Card Program "links participating healthcare providers and the [thirty-four] independent Blue Cross Blue Shield companies across the country in a single electronic network for claims processing and reimbursement" and refers to the participating healthcare providers of all the BCBSA members as "our national network." (AC ¶¶ 14-16) This language about the "links" between the local in-network providers and all other BCBSA members is a reference to privity between any in-network healthcare provider of one BCBSA member (here, Northwell and Empire respectively), and every other BCBSA member with a Blue Card Plan that insures a patient treated at Northwell.

The alleged existence of functional privity between Northwell and Defendant is also supported by allegations in the AC regarding Defendant's conduct, including:

(1) Defendant's direction to its insureds to provide Defendant's insurance cards when treated by a provider located in another state, which cards identified Defendant as a Blue Card Plan insurer, and which Northwell reasonably understood as identifying Defendant as the "Payer" contractually obligated to pay Northwell under the BlueCard terms in the Provider Agreement. (AC ¶¶ 7-8, 25-27)

(2) Defendant's repeated acceptance of the contractual benefits of access to Northwell's services and Northwell's in-network rates in the Provider Agreement (AC ¶ 43)

(3) Defendant's numerous claim determinations with respect to Northwell's treatment of Defendant's insureds, and Defendant's forwarding those claim determinations to Northwell through Defendant's agent. (AC ¶¶ 26-32)

(4) Defendant's repeated directions and authorizations to Empire, as Defendant's agent, to make payments to Northwell on behalf of Defendant for the treatment Northwell provided to

Defendant's insureds, and Defendant's providing Empire with access to the funds needed to make those payments to Northwell on behalf of Defendant.  (AC ¶¶ 31-34)

(5) Defendant's failure to inform Northwell when Defendant (i) accessed Northwell's in-network rates, or (ii) made and sent to Northwell claim determinations on Northwell claims, or (iii) directed the amount to pay Northwell and authorized Empire to make that payment to Northwell on behalf of and as the agent for Defendant, that Defendant was not a party to the Provider Agreement, was not bound by any of the BlueCard terms in the Provider Agreement, or was not contractually obligated to pay Northwell for Covered Services provided to a patient insured by Defendant's Blue Card Plans. (AC ¶¶ 26-32, 31-34, 43)

These allegations state a facially plausible claim that there was functional privity between Defendant and Northwell under the BlueCard terms in the Provider Agreement whenever Northwell, pursuant to those terms, treated patient's insured by Defendant's Blue Card Plans. This is a separate and independent basis to bind Defendant as a party to those BlueCard terms in the Provider Agreement.

### 3. The Provider Agreement, and other documentary evidence, evince Defendant's obligation to pay Northwell.

A complaint also sufficiently pleads contract privity with a non-signatory where it alleges (1) the contract contains terms anticipating the defendant's current and future involvement in the contract activity, and (2) other documentary evidence exists showing the non-signatory's liability for the contract activity.  *ESI, Inc. v. Coastal Corp.*, 61 F.Supp.2d 35, 73-74 (S.D.N.Y. 1999) (finding plaintiff adequately alleged privity with a non-signatory by alleging contract "evinces [Defendant's] current involvement and future . . . role" in the subject of the contract, and alleging "other documentary evidence exists with respect to" Defendant's liability for the subject covered in the contract.).

Here, the AC alleges in detail the terms in the Provider Agreement regarding the current and future involvement of the other BCBSA Members, including Defendant, in the Blue Card activity covered in the Provider Agreement.  (AC ¶¶ 20-38, 40-52)

The AC also alleges that other documents, including Defendant's Licensee Agreement with the BCBSA and documents relating to the Blue Card program, are consistent with the BlueCard terms included in the Provider Agreement, which state that Defendant, and not Empire, has the liability and obligation to pay Northwell, as an in-network provider of healthcare to patients insured by Defendant, the amount due under the terms of the Provider Agreement. (AC ¶¶ 14-15, 20-23, 33, 41-42, 45-46)  As noted above, the IRS Chief Counsel, after reviewing numerous documents related to the Blue Card program, agrees that Defendant, as the Home BCBSA Licensee, and not Empire, has the liability to pay the amount due to Northwell for healthcare provided to patients insured under Defendant's Blue Card Plans (IRS Memo at 6-7), and that payments by Empire to Northwell were not the result of a liability incurred by Empire, but rather are on account of provider claims against, or incurred by, a Home Licensee. (IRS Memo at 14)

Northwell pleads a facially plausible claim that the Defendant is bound by the BlueCard terms in the Provider Agreement because those terms address Defendant's current and future involvement in the payment for healthcare services provided to Defendant's insureds, and other documents, i.e. Defendant's Licensee Agreement with the BCBSA and the Blue Card Program terms governing Defendant's and Empire's participation in the Blue Card Program, confirms Defendant's status as the contractually bound Payer liable to Northwell for the payments due in accordance with the BlueCard terms included in the Provider Agreement.  This also is a separate basis to bind the non-signatory Defendant to the BlueCard terms in the Provider Agreement.

15

**4. Non-signatory's manifestation of intent to be bound.**

A pleading also sufficiently alleges contract privity with a non-signatory when it sets forth facts reasonably supporting an inference the non-signatory "manifested an intention to be bound by the contract." *See MBIA Ins. Corp. v. Royal Bank of Canada*, 706 F.Supp.2d 380, 396, 397-98 (S.D.N.Y. 2009) (citing cases). "A written contract need not be signed to be binding against a party, so long as the party indicates through performance of its terms or other unequivocal acts that it intends to adopt the contract." *Impulse Marketing Group, Inc. v. National Small Business Alliance, Inc.*, 2007 WL 1701813, *5 (S.D.N.Y. June 12, 2007).

The AC includes allegations that plausibly support a finding that Defendant, through its acceptance of both the benefits and the obligations of the BlueCard terms of the Provider Agreement, and other unequivocal acts, manifested its intention to be bound by those BlueCard terms in it. For example, Defendant on countless occasions willfully accepted the benefit of the BlueCard term in the Provider Agreement giving Defendant access to the in-network services of Northwell at Northwell's in-network rates. (AC ¶ 43) Also, Defendant on numerous occasions, consistent with the BlueCard terms in the Provider Agreement, acknowledged its contractual liability to pay Northwell's claims by (i) authorizing and directing Empire, to pay Northwell's claim, on behalf of Defendant, for care Northwell provided to patients insured under Defendant's BlueCard Plans and (ii) providing Empire with the funds to do so. (AC ¶¶ 32-34) In addition, each time Northwell submitted a claim for treating a patient insured under Defendant's Blue Card Plans, Defendant was actively involved with Empire in determining the amount due to Northwell under the terms of the Provider Agreement. (AC ¶¶ 29-32, 36-37)

For these reasons, Northwell states a facially plausible claim that Defendant manifested its intent to be bound by the BlueCard terms in the Provider Agreement.

**B. The breach of contact cases cited by Defendant are inapposite**.

Defendant cites three cases is support of its argument that Northwell has failed to plead "the existence of a … contract[.]"  (Moving Memo at 7-8)  Here, however, the AC does allege the existence of a contract to which Defendant is bound – the Provider Agreement – even though Defendant did not sign it.  *See supra* 5-7.

In *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 181-82 (2011), the court's application of "the existence of a contract" principle, is entirely inapposite here.  In *Mandarin*, the plaintiff acquired a painting after he received an appraisal letter that was addressed to someone other than the plaintiff.  The plaintiff asserted he was a third-party beneficiary of an appraiser contract between the author of the appraisal letter and some unnamed other party.  However, the plaintiff did not plead who delivered the appraisal letter to him, anything about how the person to whom the appraisal letter was written was involved in plaintiff's acquisition of the painting, or what that person's relationship was to the parties to the alleged appraiser contract.  Nor did the plaintiff allege who requested the appraiser to write the appraisal letter or what was the purpose of the appraisal letter.  *Id*. at 177.  In dismissing the claim of being a third-party beneficiary of an appraiser contract, the court said the absence of allegations about the identity of the parties to that appraiser contract or its terms "left [the court] to speculate as to the parties involved and the conditions under which this alleged appraisal contract was formed.".  *Id*. at 181-82.  Here, in this case, the Court is not left to speculate about any of the things not alleged in *Mandarin*.  *See supra* at 1-3 .

Moreover, neither the *Mandarin* case, nor the other two cases cited by Defendant, address the central issue in this case - - whether a party to a contract has alleged facts that plausibly support a claim that a non-signatory to that contract is nevertheless bound by its terms.  *See*

Moving Memo at 7-8, citing *Schaffe v. SimmsParris*, 82 A.D.3d 867, 868 (2d Dep't 2011) (in suit

to recover on an oral loan from client to law firm, defendant law firm asserted payment to firm

was not a loan but for services rendered, court reversed summary judgment in favor of plaintiff

due to disputed facts,  and claim for breach of oral loan contract was not dismissed); *Pac.*

*Carlton Dev. Corp. v. 752 Pac., LLC*, 62 A.D.3d 677, 678 (2d Dep't 2009) (court allowed breach

of contract claims against corporate defendants but not against a corporate officer defendant who

was not a party to the contract; no indication plaintiff pleaded or asserted, or the court considered,

any basis to hold a non-signatory bound to the terms of the contract).

## C.  The AC pleads the formation of the Provider Agreement and the grounds on which Defendant is bound by the BlueCard terms included in it.

Defendant separately asserts Northwell does not plead the formation of a contract

because the AC purportedly does not plead "an offer, acceptance, consideration, and mutual

intent to be bound." (Moving Memo at 8) That is disingenuous. The AC does plead the formation

of the Provider Agreement and the amendments to it and sets forth the pertinent BlueCard terms

included in that contract. (AC ¶¶ 18-23) The pleading of the terms of the signed Provider

Agreement establishes each of those elements regarding its formation.[3]

Essentially, Defendant is simply repeating its first argument that Defendant is not bound

as a party to the Provider Agreement because it did not sign it. But for all the reasons already

addressed in this Point I, Northwell has plead four separate, independent plausible bases for its

claim that Defendant, despite not being a signatory of the Provider Agreement is still bound by

the BlueCard terms in it.  The factual allegations supporting each of those four principles above,

---

[3]The case Defendant cites in support of its argument that no contract was formed involved an alleged oral agreement to provide consulting services in exchange for equity of the Defendant business.  It is yet another inapposite case. See Moving Memo at 8, citing *Krolick v. Sloane*, 2021 WL 5280990, *4 (S.D.N.Y. Nov. 12, 2021).  In *Krolick,* the Court noted the heightened pleading standard of the definite terms of the oral contract. Here, the AC pleads the definite BlueCard terms by quoting the pertinent terms included in a signed written agreement.

also plausibly support and satisfy, among other things, the contract formation elements Defendant believes are lacking here.

**POINT II:  The AC Pleads A Valid Third-Party Beneficiary Claim.**

The AC alleges the BCBSA entered into the same form Licensee Agreement with each of its member Licensees and that such agreements require that each Licensee "comply with the Membership Standards," including that each of them "effectively and efficiently participate in [the Blue Card Program] . . . for the purposes of providing portability of membership between the Plans and ease of claims processing for customers receiving benefits outside of the Plan's Service Area" and that each of them also "take such action as required to ensure its financial performance in the" BlueCard Program.  (AC ¶¶ 11-13)

Northwell alleges that to comply with these Membership Standards in the Blue Card Program, each BCBSA Licensee has agreed that "when a person insured under a BlueCard Home Plan receives healthcare services in a Host BlueCard plan's exclusive area from an in-network participating provider of that Host BlueCard plan, then the BlueCard Home Plan had to effectively and efficiently pay or reimburse that in-network participating provider of the Host Plan in accordance with the terms of that in-network participating provider's agreement with the Host Blue Card Plan."  (AC ¶ 56; ¶¶ 15-16, 20-23, 41, 45-46)

Northwell alleges that it is a third-party beneficiary of (1) those Membership Standards, including the required obligation of the Home Plan "to effectively and efficiently pay or reimburse" the Host Plan's in-network provider "in accordance with the terms of that in-network provider's agreement with the Host Blue Card Plan," and (2) any other agreement between Empire and Defendant, or among the BCBSA Member companies as a group, with respect to the BlueCard Program.  (AC ¶ 56)

Defendant argues the third-party beneficiary claim is untenable because Northwell does not cite any provision of the BCBSA Licensee Agreements or the terms of the Blue Card Program referenced in them that "clearly evidences the parties' intent to allow enforcement" by Northwell.  (Moving Memo at 10)  First, it is premature to raise this ground for dismissal because Defendant has not submitted the pertinent agreements or the terms of the BlueCard Program. *Bild v. Konig*, 2011 WL 1563576, at *2 (E.D.N.Y. Apr. 25, 2011) (reverses prior order dismissing third-party beneficiary claim when complete copy of the agreement had not been before the court); *see also Thomas v. New York City*, 814 F. Supp. 1139, 1152 (E.D.N.Y. 1993) (when parties have not submitted the contract "the Court is unable to determine the issue of whether the plaintiffs are in fact third-party beneficiaries.); *Pollock v. Ridge*, 310 F. Supp. 2d 519, 526 (W.D.N.Y. 2004) (denying motion based on  unauthenticated contract).

In addition, Defendant ignores that the third party's right to enforce an agreement is upheld when (1) "no one other than the third party can recover if the promisor breaches the contract," or (2) "the contract otherwise clearly evidences an intent to permit enforcement by the third party, as by fixing the rate at which the third party can obtain services or goods." *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y.2d 38, 45 (1985) (citations omitted). Moreover, it is appropriate to look at surrounding circumstances, not just the face of the agreement, to ascertain if there are obligations due to a third-party beneficiary.  *Aievoli v. Farley*, 636 N.Y.S.2d 833 (2d Dept. 1996).

Here, the AC alleges the BCBSA licensees' participation in the Blue Card program includes requiring terms in their in-network provider agreements that a Home Plan is responsible to pay the healthcare claim of the in-network provider of the Host Plan at the same applicable rates in, and subject to all other terms of, the in-network agreement between the provider and the

Host Plan. (AC ¶ 56; ¶¶ 15-16, 20-23, 41, 45-46)  That the BCBSA's agreement with its licensees fixes the rate at which those licensees are to pay the local in-network provider for the treatment of the Home licensee's insureds; *i.e.,* the amount due under the provider's agreement with its local Host BCBSA licensee, plausibly supports a claim that the BCBSA and its licensees intended to permit their in-network providers to enforce the obligation of Home BCBSA licensees to pay for a provider's treatment of a patient insured by the Home BCBSA licensee.

Moreover, when an in-network provider is not paid the correct amount required under the terms of its in-network agreement, then there is no one other than that provider who is injured by that underpayment, and therefore, that provider is the only one with any interest in enforcing its contractual right to payment in the proper amount under the terms of its provider agreement.

In addition, the following surrounding circumstances show the intent of the BCBSA and its members to allow provider enforcement in the event the Home Plan breaches its obligation to pay the Host Plan's in-network provider that treated the Home Plan's insureds:

(1) the statements on the BCBSA website that the BlueCard Program is intended to link the in-network providers of one BCBSA Licensee in a single network with all other BCBSA Licensees for purposes of payment of the provider claims; (AC ¶ 14);

(2) the conduct of Empire in including in the Provider Agreement terms that require the Home BCBSA Licensee to pay Northwell, and to pay Northwell the amount due under all the terms of the Provider Agreement, which evinces Empire's understanding that including such terms in the Provider Agreement was requirement of Empire's obligation to adhere to its Licensee Membership Standards relating to the BlueCard Program; (AC ¶ 56; ¶¶ 15-16, 20-23, 41, 45-46); and

(iii) the conduct of Defendant both by accepting the benefits of the BlueCard Program requirement giving its' Home Plans access to the in-network rates of Northwell (AC ¶ 43), and by honoring its own obligation in the BlueCard Program to authorize Empire to pay Northwell on behalf of Defendant and then immediately reimbursing Empire for having done so on Defendant's behalf.  (AC ¶¶ 31-34)

For these reasons, Northwell pleads a plausible claim as a third-party beneficiary of the BlueCard Program related terms in the BCBSA Licensee Agreement, and any other agreement

between Empire and Defendant, or among the BCBSA Member companies as a group, with respect to the BlueCard Program.

**POINT III:  The Third Cause Of Action States A Valid, Alternative Quasi-Contract Claim.**

    **A.    Defendant benefited from Northwell's healthcare services.**

Defendant asserts Northwell's quasi-contract unjust enrichment claim fails because "Northwell does not plausibly allege that it conferred any benefit on [Defendant] as opposed to [Defendant's] members." (Moving Memo at 10)

However, courts repeatedly hold that a healthcare provider's treatment of a patient is a benefit to the insurer.  The benefit to the insurer "is not the provision of the healthcare services *per se*, but rather the discharge of the obligation the insurer owes to its insured." *Emergency Physician Services of New York v. UnitedHealth Group, Inc*., 2021 WL 4437166 at \*12 (S.D.N.Y. September 28, 2021) (*quoting Plastic Surgery Ctr. v. Aetna Life Ins. Co.*, 967 F.3d 218, 240-41 (3d Cir. 2020); *N.Y.C. Health & Hosps. Corp. v. Wellcare of N.Y., Inc.*, 937 N.Y.S.2d 540, 545 (N.Y. Sup. Ct. 2011) ("an insurance company is unjustly enriched if it fails to pay the hospital in full for the costs incurred in rendering the necessary treatment to the insured's enrollees.").  *See also El Paso Healthcare Sys., LTD v. Molina Healthcare of N.M., Inc.*, 683 F. Supp. 2d 454, 461-62 (W.D. Tex. 2010) (insurer "did receive the benefit of having its obligations to its plan members . . . discharged," which the insurer "enjoyed and accepted" and "even acknowledged as much when it tendered payment for them at a rate it deemed to be proper.").[4]

---

[4] See also *Fla. Emergency Physicians Kang & Assocs., M.D.,* 526 F. Supp. 3d 1282, 1303 (S.D. Fla. 2021) (allowing claim based on benefit "provided to an insurer through a healthcare provider's provision of services to an insured") (citing cases); *Cal. Spine & Neurosurgery Inst. v. Oxford Health Ins. Inc.*, 2019 WL 6171040, at \*6 (N.D. Cal. Nov. 20, 2019) (same) (citing cases); *Temple University Hospital, Inc. v. Healthcare Management Alternatives, Inc.*, 832 A.2d 501, 507 (Pa Super. 2003); *River Park Hospital, Inc. v. BlueCross BlueShield of Tennessee, Inc.*, 173 S.W.3d 43, 59-60 (Tenn. Ct.App. 2002) ("both parties were required to deal with one another; neither had any choice. . . . Under these circumstances, we must find a contract implied in law, without the assent of either party, on the basis that it is dictated by reason and justice.").

The AC pleads this same and other benefits received by Defendant (AC ¶¶ 72, 76-80), and, like the insurer in the *El Paso Healthcare* case, Defendant "even acknowledged as much when it tendered payment for them at a rate it [incorrectly] deemed to be proper." (AC ¶¶ 71) Therefore, the AC plausibly pleads Defendant benefitted from the healthcare services Northwell provided to patients insured under Defendant's BlueCard Plans. The cases Defendant cite in support of its argument have been rejected or distinguished on grounds that also exist here.[5]

**B.    The alternative quasi-contract claim is not governed by any contract.**

Defendant also asserts the *quasi-contract* claim fails because the Provider Agreement governs the alleged underpayments by Defendant. Defendant is wrong. The breach of contract claim seeks to hold Defendant liable under the Provider Agreement as the designated "Payer" responsible to pay for the healthcare services Northwell provided to Defendant's insureds. (AC ¶¶ 21-22, 33-34) The breach of contract claim is based on the clear language in the Provider Agreement stating Defendant is the legally responsible Payer of the amounts due Northwell. (*Id*.) Defendant in its Motion denies it has any obligation under the Provider Agreement to pay Northwell for the healthcare provided to Defendant's insureds because Defendant did not sign the Provider Agreement.

In anticipation of that position, Northwell plead the quasi-contract claim in the alternative; *i.e.*, the quasi-contract is only viable, if Defendant is correct that it is not bound by

---

[5] Defendant first cites *Plastic Surgery Ctr.*, *P.A. v. Cigna Health & Life Ins. Co.*, 2019 WL 1916205, *8 (D. N.J. Apr. 30, 2019). *But see Plastic Surgery Ctr. v. Aetna Life Ins. Co.*, 967 F.3d 218, 240-41 (3d Cir. 2020) (Third Circuit rejects assertion that a healthcare insurer is not benefitted by a provider's treatment of a patient insured by the insurer. Defendant also cites *Travelers Indem. Co. of Conn. v. Losco Grp.*, *Inc.*, 150 F. Supp. 2d 556, 563 (S.D.N.Y. 2001). *But see Plastic Surgery*, 967 F.3d at n. 26 (noting *Travellers* did not involve a healthcare insurance claim or insurance, and involved a quantum meruit claim, not an unjust enrichment claim, and questioning reasoning of the case); *Emergency Physician*, 2021 WL 4437166 at *12 (distinguishing *Travelers* on the ground it did not involve medical insurance, and noting the construction work in *Travelllers* was provided at the insured's "behest," as opposed to the medical treatment the providers alleged they were compelled by law to give its patients). The same distinctions are present here. (AC ¶¶ 59-63) and (AC ¶ 66).

23

the BlueCard terms in the Provider Agreement because it is not a signatory. (AC, Third Count, ¶57) Defendant now asserts that even if it is not bound as the legally responsible Payer under the terms of the Provider Agreement, the Provider Agreement still governs the dispute because Northwell admits "only 'Empire . . . makes the payment'" to Northwell. (Moving Memo at 12) But that simply is not true. As already noted, the Provider Agreement does not impose on Empire any obligation to pay Northwell, but rather imposes that obligation on Defendant.  Even then, Empire only makes the payment in the amount it is directed to pay by Defendant, and Empire does so with the prior authorization of Defendant, and on behalf of, and as an agent for, Defendant. *See supra* at 3.

Because Empire only made prior payments to Northwell at the direction and with the authorization of Defendant to make the payment on behalf of Defendant, with funds provided to Empire by Defendant, if Defendant is not bound as the Payer of Northwell's claims under the Provider Agreement, then there is no other provision in that contract regarding the entity responsible to pay Northwell for treatment it provides to patients insured under Defendant's Blue Card Plans. Empire is not so obligated (AC ¶¶ 21-22, 33-34); Defendant would not be so obligated; and no other BCBSA member is so obligated (AC ¶¶ 21-22). Therefore, as construed by Defendant, the Provider Agreement would not govern a dispute regarding who is legally responsible to pay Northwell for the medical treatment Northwell already provided to patients insured by Defendant's Blue Card Plans.

Northwell, therefore, properly pleads the quasi-contract claim in the alternative. *See Kapsis v. American Home Mortg. Servicing Inc*., 923 F. Supp. 2d 430, 454 (E.D.N.Y. 2013) (plausible unjust enrichment claim, pleaded in the alternative, cannot be dismissed unless there is a court finding a contract governs).

Defendant also prematurely raises this argument that the Provider Agreement governs any right Northwell has to recover for its healthcare services provided to patient's insured under Defendant's Blue Card Plans. *St. John's University v. Bolton*, 757 F. Supp. 2d 144, 183-185 (E.D.N.Y 2010).  At the pleading stage "[Northwell] is not required to guess whether it will be successful on its contract . . . or quasi-contract claims," and is allowed under Rule 8 to plead such claims in the alternative, "even if the legal theories underlying those claims are technically inconsistent or contradictory." *Id.* at 183-84.  Moreover, because Defendant did not include in its Moving Papers the contract it states governs the dispute (*St. John's*, 757 F. Supp. 2d at 184), and Defendant "dispute[s] the scope and enforceability of the [pertinent] terms in the Agreements as alleged" (*Id.*), "the court is in no position to finally determine the meaning and effect of contracts the parties have not presented to it; [nor] can the court determine whether conduct that has yet to be established falls within the scope of the alleged contracts." *Id.* at 184. The Court should therefore deny the motion to dismiss the quasi-contract claim.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully submits that the Court deny Defendant's motion to dismiss Northwell's Amended Complaint pursuant to Fed. R. Civ. P. 12 (b) (6) in its entirety.

DATED:        New York, New York
              September 6, 2023

                              BUTLER TIBBETTS, LLC


                    By:        /s/ *TIMOTHY F. BUTLER*
                              Timothy F. Butler, Bar No. TB8749
                              Meredith F. McBride, Bar No. MM2783
                              David J. McCarthy, Bar No. DM7910
                              *Attorneys for Plaintiff Northwell Health, Inc.*
                              Nine East 45th Street, 9th Floor

New York, NY 10017
Telephone: (203) 656-1066
tbutler@butlertibbetts.com